Argued October 28, 1953, affirmed February 24, 1954

## HULL *v.* CLEMENS ET AL.
267 P. 2d 225

534

*Jack H. Dunn*, of Myrtle Point, argued the cause for appellant. On the brief were Dement, Dunn and Meldrum, of Myrtle Point.

*Pat H. Donegan*, of Burns, argued the cause and filed a brief for respondents.

Before LATOURETTE, Chief Justice, and ROSSMAN, LUSK, TOOZE and PERRY, Justices.

ROSSMAN, J.

This is an appeal by the plaintiff, Elvin Hull, from a decree of the circuit court which dismissed this suit. The order of dismissal as to the defendant, J. C. Clemens, ordered him [he having made the offer] to enter upon the records satisfaction of a judgment which he had recovered June 12, 1944, in the Circuit Court for Coos County against Hull and his wife, Milla, in the sum of $6,480. The decree recites that during the course of the trial the suit was dismissed on motion of the plaintiff as to the other two defendants, Samuel Carter and Veva L. Carter. The suit, as originally instituted, sought specific performance of a contract for the conveyance by defendant Clemens to Hull and his wife of a tract of 320 acres of land situated in Harney County, or, in the alternative, damages for nonconveyance. During the trial the plaintiff became satisfied that the Carters had purchased the property in good faith, for a valuable consideration and without notice of the plaintiff's interest in the property. It

was for that reason that the plaintiff moved for a dismissal of the suit as to the Carters. The plaintiff-appellant, Hull, of course, does not attack the parts of the decree which (1) dismissed the suit as to the Carters; (2) ordered defendant-respondent Clemens to satisfy upon the records his judgment against the Hulls; and (3) denied the plaintiff the remedy of specific performance. He assigns as error the court's refusal to award him damages for the omission of Clemens to have conveyed to him the aforementioned property. The complaint avers damages in the amount of $9,822.10. Hereafter we may refer to plaintiff-appellant Hull as Hull, to his wife as Mrs. Hull, to defendant-respondent Clemens as Clemens and to defendants Carter as the Carters. Mrs. Hull is not a party to this case and the Carters are neither appellants nor respondents.

The facts, except those which indicate the value of the property, are free from dispute. Hull and his wife, as purchasers, and Clemens, as vendor, signed a contract October 16, 1939, whereby (1) the Hulls agreed to pay Clemens the sum of $9,600 for the tract of land with which this appeal is concerned, and (2) Clemens agreed to convey the property to the Hulls when they had paid in full the purchase price. The contract required the Hulls to pay $1,500 concurrently with the execution of the contract and the balance of the purchase price in annual installments of $810. Unpaid balances bore interest. The contract granted to the vendees possession of the property but retained in Clemens, as vendor, title until the entire purchase price had been paid. The Hulls made the initial payment and took possession. Thereafter they seasonably made the first two annual payments.

By 1942 the Hulls had met with financial reverses and found themselves unable to discharge the installment payment which became due October 16 of that year. As a witness, Hull explained, "I had financial reverses of very serious nature." He added that because of the "shortage of men" arising out of the war conditions he was unable to work the property properly. In addition to operating the Harney County property, Hull conducted a venture in Myrtle Point, Coos County, which he identified as "a truck business or transfer business." His home was in Powers, Coos County. Evidently, as a result of his straitened financial condition, he sold some of the livestock which he had upon the Harney County acreage. Since he testified that in or about the year 1945 he worked for wages in the logging industry, it may be that his truck business was not profitable.

On or about October 16, 1942, when the installment payment for that year became due, Hull told Clemens that he wished to be released from the contract. The brief which his counsel filed in this court says: "During the early part of November, 1942, plaintiff advised defendant that it was his intention to give up the land and offered to release his interest in the property arising out of the contract." When Hull so told Clemens the latter replied that, since Hull had had the use of the land for the current year and had taken the crop which it produced, he ought to discharge the year's installment payment. Hull declined to make the payment and, according to his testimony, left the property. Neither he nor his wife returned to Harney County until the summer of 1948. When the Hulls left Harney County an action had been filed against Hull in that county by an individual named Jordan. The evidence does not disclose the nature of that case, but Hull, in

referring to it, said "that's one thing that made it bad for me."

Clemens testified that in November, 1942, Hull owed him, in addition to the 1942 installment money, $150 for a bull which he purchased from Clemens the preceding year. In October of 1942 Clemens discovered, so he swore, that the Hulls were selling their cattle and he thereupon suspected that they intended to quit the property which they had undertaken to purchase from him. Having made that surmise, Clemens tried to find Hull for the purpose of inquiring of him as to his intentions. Presently Clemens encountered Hull upon one of the public roads. We now quote from Clemens' testimony:

"Q What was said at that time?
"A Well, he said he was leaving to buy him another ranch over at Eugene, and he had given up the place, he was through with Harney County, it was too far away from his operations, he couldn't manage it.
"Q What did you say?
"A Well, I says, 'Elvin, you have paid enough on this contract. Why don't you go on with it?' He says, 'No, I don't want any more to do with it. I think I paid you enough on it.' I says, 'I want my payment.'
"Q By 'your payment' what did you refer to?
"A The one that was due that he hadn't paid. He had used it that year, and I wanted my payment, and also I wanted the $150 for a bull that he had bought the year before and had never paid me;
* * * ."

The conversation ran on, but it produced nothing for application upon the purchase price of the bull nor for discharge of the current installment payment upon the contract which the parties had signed in 1939. We

quote further from Clemens' version of the conversation:

"Q Did he leave you with the impression that he was through with Harney County?

"A That's the impression he gave me, and that's what he told me.

"Q Did he leave at that time?

"A Yes, never saw him any more.

"Q When did you next see him?

"A '48, or he came back here—I guess '48 was when he came back here, '49.

"Q Did he ever attempt to pay you for the bull?

"A No.

"Q Did he ever attempt to make any payment for the land?

"A No.

"Q Did he ever communicate with you?

"A No.

"Q Did Mrs. Hull ever communicate with you?

"A No."

We are of the opinion that Clemens' testimony reflects the truth concerning the conference which occurred immediately prior to the Hulls quitting the land.

November 23, 1942, Clemens, as plaintiff, instituted an action in the Circuit Court for Coos County against the Hulls, as defendants, in which he prayed for judgment for the unpaid balance of the purchase money, $6,480. We now return to Hull's testimony:

"Q When did you make up your mind, Mr. Hull, to abandon this Clemens land?

"A Well, truthfully, after the suit was served upon me for the full balance. There was no alternative."

We shall presently return to the Coos County suit, but, in the meantime, we will take note of some other developments. Hull had not paid the 1942 taxes when

he left the property, and after leaving he made no inquiries as to whether anyone was discharging them. Although the signatures to the contract between the Hulls and Clemens had been acknowledged before a notary public, Hull did not record the instrument in any of the public records. He conceded that he made no investigation to determine whether anyone had taken possession of the property after he left, and that likewise he sought no information as to the condition of the property. After leaving the property in 1942 and until returning in 1948, the Hulls never asserted any interest in it.

The above was the state of affairs in November, 1942, when Clemens filed the action in the Circuit Court for Coos County demanding judgment for the unpaid balance of the purchase money, $6,480. Clemens' complaint quoted in full the contract which he, as vendor, and the Hulls, as vendees, signed October 16, 1939. It acknowledged payment by the Hulls of the initial payment of $1,500 and the installments, each in the sum of $810, which the Hulls had paid in the years 1940 and 1941. It did not tender a deed to the Hulls. The latter appeared in the case through counsel and filed a general denial. June 12, 1944, the cause was called for trial. At that time the Hulls, through their counsel, confessed Clemens' right to a judgment and on that day the circuit court entered judgment in favor of Clemens and against the Hulls for $6,480, together with costs and interest. When the Hulls confessed the right of Clemens to judgment, they did not ask that he deliver a deed to them or that provision be made whereby they could secure one upon payment of the judgment. In truth, if a conveyance, or provision for one, was discussed when the judgment was confessed, no witness mentioned the fact. Likewise, at that juncture Hull,

notwithstanding the fact that he now claims that the contract remained in effect after the judgment was entered, did not record it. Shortly after entry of the judgment, a writ of execution was issued which was levied upon some cattle belonging to the Hulls. The subsequent execution sale yielded a negligible amount for application upon the judgment.

According to Hull, the property was worth no more in June, 1944, when the court entered judgment in the Coos County case, than two years before, when the action was filed.

It was the judgment, described in the preceding paragraphs, which the decree entered in the case at bar required Clemens to satisfy upon the public records. According to the transcript, the satisfaction has been entered.

The tract of land which is the subject matter of this action is irrigated hay land. Before the Hulls abandoned its possession they used it for pasturing cattle and raising hay. The property, its grass, fences and irrigating facilities require frequent care. After leaving the property in November of 1942, the Hulls gave no attention whatever to it and, as we have said, were continuously away from Harney County until the summer of 1948.

Seven days after the entry of the Coos County judgment, Mrs. Hull filed a petition to be adjudged a bankrupt. Her schedule of assets did not mention the property involved in this proceeding, and, as the brief of Hull's counsel concedes, she "did not claim an interest in the property as an asset." June 27, 1944, she was adjudged a bankrupt. Before the action now under review was instituted, Mrs. Hull assigned her interest, if any, in the property involved in this action to her husband.

In the middle of February, 1943, Clemens resumed possession of the property. February 12, 1945, he and the Carters entered into an agreement whereby the Carters agreed to purchase the land in question for the sum of $7,000, and Clemens agreed to convey it to them when they had paid the purchase price. The Carters made an initial payment of $2,000 and were bound by the agreement to discharge the balance of $5,000 in annual installments of $625, together with interest. Simultaneously with the signing of the contract, the Carters took possession of the property. September 13, 1948, the last installment of the purchase money was paid and thereupon Clemens delivered to the Carters a warranty deed which conveyed to them title to the land. The Carters had no information whatever concerning the Hulls or of the agreement which they and Clemens had signed October 16, 1940.

In the summer of 1948 Hull called upon Clemens and offered to pay the balance of the purchase price. He demanded a deed to the premises.

March 14, 1949, Hull, as plaintiff, instituted the proceeding now under review. As we have said, he prayed for specific performance, or, in the alternative, for damages if specific performance was denied.

We have mentioned the fact that, upon Hull's motion, the circuit court dismissed the suit as to the Carters. Before the motion was made, Hull had satisfied himself that the Carters had purchased in good faith, without notice and for value. At the close of the trial, the court dismissed the suit as to Clemens on the ground that the plaintiff was barred by laches, but the court indicated a belief that, apart from laches, the evidence failed to disclose that Hull had suffered damage. Notice has been taken of the fact that the court ordered Clemens to satisfy of record the judg-

ment which he had obtained against the Hulls and that the satisfaction has been made.

The foregoing, we believe, states the material facts, with the exception of one which we will now mention. The plaintiff testified that in the fall of 1945 the price of cattle began "to climb" and that since "land valuation in Harney County lots of times is based on markets for cattle," the market value of land in the county before long began to ascend. In 1947 a friend told him, so Hull testified, "Land is booming in Burns." Burns is the county seat. The friend added, according to Hull, "Ranches are selling for terrific prices, $100 an acre." Hull testified: "Of course, that made me feel pretty good." Before long he obtained an attorney's services and, with the aid of the latter, procured a loan of money. Then the attorney and Hull called upon Clemens and made the offer to pay the balance of the purchase price of the land which precipitated this suit.

The plaintiff assigns as error the dismissal of the complaint against the defendant Clemens and the refusal of the court to award damages. The grounds of the plaintiff's contentions are (1) the contract is valid and enforceable; (2) by bringing an action upon the contract in Coos County and obtaining a judgment for the balance of the purchase price, Clemens "irrevocably elected to affirm the contract"; (3) the rights of the plaintiff were not merged in the Coos County judgment; (4) the plaintiff is not barred by laches or the statute of limitations; and (5) the defendant is liable for damages for his inability to convey to the plaintiff.

Proceeding with his belief that the contract of 1939 [between Clemens, as vendor, and the Hulls, as vendees,] was still in effect after the Coos County judgment was rendered, Hull claims that Clemens breached

it in the summer of 1948 when he refused to convey title to Hull after the remainder of the purchase money had been tendered; hence, his demand for damages.

We shall now consider the principles of law which govern the case.

In *Sievers v. Brown,* 34 Or 454, 56 P 171, 45 LRA 642, it is said:

> "A bond for a deed transfers to the obligee an equitable interest in the premises agreed to be conveyed, which is measured by the amount paid on account of the purchase. The legal title remains in the obligor, in trust for the purchaser, who, upon payment of the entire consideration, acquires the whole equitable interest, and may maintain a suit to compel the specific performance of the contract, if the obligor refuse to keep his covenants."

■■ When Clemens, as vendor, and the Hulls, as vendees, signed the contract out of which this suit arose, and the Hulls made the initial payment of $1,500, the legal title reposed in Clemens, but an equitable interest was transferred to the Hulls. The contract conferred upon the Hulls a right to demand a deed to the premises whenever they paid the full contract price. Since the equitable interest of a vendee is always measured by the amount which he has paid upon the purchase price, the interest of the Hulls had increased somewhat by November of 1942 when they moved off the property.

In reverting to a fact which we have already mentioned, we repeat that when the Hulls quit the property Hull wished to abandon it and to surrender the contract. As a witness, he emphasized his statement to that effect by swearing, "There was no alternative."

From the foregoing we see that when the Hulls vacated the property they had an equitable interest in it, and Clemens held the legal title awaiting the day

when they would discharge the full purchase price. But when the 1942 installment payment fell due, Hull had made up his mind that he would not pay it and that he would proceed no further with performance of the contract. Such was the condition of affairs when the Hulls left the property.

The preceding paragraphs state in narrative form the facts from which we must determine whether or not the Hulls lost their interest in the property through abandonment. The following is a summary of those facts: (1) In November, 1942, before the Hulls quit the property, Hull informed Clemens that he and his wife were leaving the property and that they desired to surrender their contract of purchase; (2) after the Hulls had quit the property they made no more payments upon the purchase price of the property and never expressed any intentions concerning payments upon it until Hull, in 1948, offered to pay the remainder of the purchase price; (3) after the Hulls left in November of 1942 they did not return to Harney County until midsummer of 1948; (4) when they quit the property, the current taxes were unpaid and they did not thereafter pay them nor any of the subsequent levies; (5) although the property required frequent attention, the Hulls gave it none after leaving and made no provision whereby it would receive any; (6) after (a) Hull's offer to surrender the contract had been rejected, (b) the Hulls had left the property, and (c) the Hulls were sued for the purchase money, Hull made up his mind to abandon the property; he explained, "There was no alternative"; (7) when the Hulls confessed the right of Clemens to judgment in the Coos County case, they did not ask that a deed be issued to them; (8) in the schedules which Mrs. Hull filed in her bankruptcy proceeding she did not mention this prop-

erty nor claim any interest in it; her interest, if any, was the equal of Hull's; (9) the answer which the Hulls filed in the Coos County action, consisting of a general denial, was a denial of the contract under which Hull now claims an interest in the property; (10) even after the Hulls had vacated the property, they did not record the contract which they and Clemens had signed.

In *Jennisons v. Leonard,* 88 US 302, 22 L ed 539, the court said:

> "This was one of the sales of real estate by contract, so common in this country, in which the title remains in the vendor and the possession passes to the vendee. The legal title remains in the vendor, while an equitable interest vests in the vendee to the extent of the payments made by him. * * * The interest of the vendee is equitable merely, and whatever puts an end to the equitable interest—as notice, an agreement of the parties, a surrender, an abandonment—places the vendor where he was before the contract was made."

It will be observed that the court recognized that the equitable interest of a vendee may be extinguished by "an abandonment".

We think that other observations made by the court in *Jennisons v. Leonard,* supra, are germane to the case before us, and will now give that decision further attention. The subject matter of the dispute between the parties in that case was timber cut from a tract of timberland of which Leonard [plaintiff and respondent] was the owner and vendor. The defendants and appellants, Jennisons, were mortgagees of one Cole, who was the vendee. When Cole could no longer perform his contract, the Jennisons succeeded to his rights. The purchase contract required Cole to pay the purchase price in installments, the amount being affected

by the quantity of timber cut. We now quote from the decision:

> "A dispute soon arose as to the amount thus due and on the 4th of September, 1867, the Jennisons refused further to 'operate' on the land, but abandoned the land and had not since removed any timber therefrom."

When the Jennisons abondoned possession, Leonard, the owner, resumed possession of the land. At that time there was upon the ground a considerable quantity of timber which Cole had felled. Leonard took possession of it. When those acts occurred, $5,280 was unpaid upon the contract of purchase. In order to realize that sum, Leonard had the downed timber manufactured into lumber. The Jennisons seized the manufactured lumber under a claim that they were the owners of the logs out of which it had been manufactured. The dispute between the parties was centered in the ownership of the logs, and in order to determine their ownership it was necessary to determine whether the equitable interest created by the contract had been terminated before Leonard reentered into possession. We now turn again to the language of the decision:

> "A dispute arising as to the amount thus to be paid, 'they abandoned the lands, and the vendor entered into peaceable possession' for the alleged breach, vis., the nonpayment of $5,280, and took possession of all the timber that had been cut and had not been removed.
>
> "Looking at the circumstances that Cole had refused to perform, and had surrendered and assigned all his interest in the contract and the timber; that the Jennisons had ceased their operations and had abandoned the land; that Leonard had entered into possession of the land and the timber cut  *  *  *  it seems sufficiently plain, not only that Leonard was the owner of and lawfully in possession of the

timber and lumber in question, but that his right was assented to by all parties who were in a condition to question it. The Jennisons not only failed to show any title to the lumber at any time, but voluntarily abandoned whatever interest they might be supposed to have had.''

In affirming judgment for Leonard, the vendor, the decision said:

"No mode of terminating an equitable interest can be more perfect than a voluntary relinquishment, by the vendee, of all rights under the contract, and a voluntary surrender of the possession to the vendor. The finding of the court shows that this took place in relation to the premises in question, and that the surrender was accepted by the vendor.''

The following is taken from Thompson on Real Property, Perm ed, § 2565:

" 'Abandonment' is the relinquishment of a right; the giving up of something to which one is entitled, but without vesting the ownership thereof in any other person. The intention to abandon and the act of abandonment must concur. Property is 'abandoned' when the owner walks off and leaves it with no intention to again claim it or exercise rights of ownership over it. It is the giving up of a thing absolutely, without reference to any particular person or purpose. There is also a distinction between the abandonment of property and the mere neglect thereof. * * * 'The abandonment of property is the relinquishing of all title, possession, or claim to or of it,—a virtual intentional throwing away of it.' There can be no such thing as an abandonment of land in favor of a particular person, or for a consideration.''

Substantially the same is said in *Dober v. Ukase Investment Co.*, 139 Or 626, 10 P2d 356, *Bitney v. Grim*, 73

Or 257, 144 P 490, and *Huffman v. Smyth,* 47 Or 573, 84 P. 80.

The authorities seem to agree that one who possesses a perfect legal title cannot lose it by abandonment. 1 Am Jur, Abandonment, § 6, p 5, and Thompson on Real Property, Perm ed, § 2567. However, it is well established that an unperfected equitable title may be lost by abandonment. *Mineral Land Investment Co. v. Bishop Iron Co.,* 134 Minn 412, 159 NW 966, LRA 1917D 905. This court recently held in *Powers v. Coos Bay Lumber Co.,* 200 Or. 329, 263 P2d 913, 'that the rights conferred by an easement may be extinguished by abandonment. That decision also held that in abandonment time is an immaterial element. It pointed out that the moment intention to abandon unites with acts of relinquishment, the abandonment is complete.

*Oviatt v. Big Four Mining Co.,* 39 Or 118, was an appeal by the plaintiff from a dismissal of a suit to enjoin a diversion of water from a ditch. The defendant's predecessors were the owners of land, used for mining, and one Courtney who claimed by a land contract. Courtney gave a note for the purchase price and received a bond to secure the delivery of a deed upon payment of the note. Courtney entered upon the land, constructed a ditch and took water flowing from a creek. A year later, Courtney left the land never to return, leaving a man on the premises to "look after things." Fifteen years later the plaintiff diverted water from Courtney's ditch, and a few years later the defendant laid claim to the water on the basis of a conveyance from Courtney and by purchase at a tax sale of the prior owner's interest. The court reversed for the plaintiff on the ground that the defendant's predecessor abandoned the property to which the water

rights were appurtenant and that the plaintiff had acquired the water by appropriation. In so doing, it said:

> "In the light of these decisions [earlier water right cases in Oregon], we think it is apparent that Courtney intended to abandon the ditch and water right when his promissory note matured, and his right to enforce the bond for a deed was lost by nonpayment thereof. When he left Hall in charge of the property, he probably had until the following spring in which to meet the payment of his obligation; and until that time expired he may have entertained a hope of securing a purchaser, or obtaining money in some other manner to pay for the mines. But, when he defaulted in payment of his note, we think he voluntarily surrendered all his interests in the ditch and water right to the persons from whom he agreed to purchase the premises."

It should be noted that Courtney's interest was equitable.

■ In the case at bar, the Hulls' title—an unperfected equitable title—was inchoate when they quit the property. Therefore, it was subject to abandonment.

As we have seen, Hull, as a witness, declared that after the Coos County case was filed he decided to abandon the property. He makes no claim that he misspoke himself. The evidence indicates that the Hulls had reached that conclusion before the 1942 installment payment fell due. When Clemens called upon Hull and asked for the payment, Hull declared that he wished to vacate the property and surrender the contract, but, if his testimony concerning the incident reflects the truth, he did not then use the word "abandon". His actions about the time when the 1942 payment fell due are strongly indicative of abandonment. It will be recalled that the Hulls were then selling their cattle and that they had met with financial misfortunes. According to

Clemens, Hull told him that he was "through" with this property and "through" with Harney County. After they left Harney County they were indifferent to the property.

We think that the evidence presented in this case shows something more than mere neglect by the Hulls of the land which they had undertaken to purchase. In our opinion, it also shows something more than nonuser. It establishes nonuser coupled with an intention upon the part of the Hulls to release their rights. In short, it manifests intention to abandon, together with actual acts of abandonment.

Very likely Hull's plight, when the day came to make the 1942 payment, was an unfortunate one. He had suffered severe financial reverses and had resorted to the sale of his cattle. Seemingly, when the time came to make the 1942 payment, he was avoiding Clemens. His own testimony indicates that about that time he was trying to avoid the service of process upon him in a case which a man by the name of Jordan had filed. It is not unusual in situations of that kind for the victim of misfortune to pull up his stakes and move on to another place which offers greater hope. That is what we believe Hull did. Without reviewing the testimony further, we express our belief that the evidence clearly indicates that in November of 1942 the Hulls abandoned the land and all of their rights in it. Hull moved on to his business venture in Coos County.

■■ Sometime after the entry of the Coos County judgment, land values in Harney County underwent startling inflation. When that development occurred, Hull bethought the recent past and seemingly looked around in an effort to regain his hold upon the land which a few years previously he had walked away from, but which now gave promise of easy wealth. Soon he

secured the services of a capable lawer and then got the promise of a loan. With money in sight with which to discharge the old balance of the purchase price, a road was mapped out whereby it was thought the property could be recaptured. The line of approach was to consist of a theory that when Clemens brought the Coos County action for the balance of the purchase price he had thereby elected to affirm the contract. The plan was to argue that an election to affirm was inconsistent with a claim of abandonment, but the argument was foredoomed to failure. Abandonment has the novel phase that it is entirely unilateral—it requires action by only the possessor of the title, right or equity which it is proposed to abandon. Rights and equities are never abandoned in favor of anyone. Therefore, Clemens' attitude was immaterial.

We are satisfied that the Hulls abandoned their title to the property. They had no interest whatever in it when Hull appeared in 1948 and tendered the purported balance. It is, therefore, unnecessary to consider other contentions advanced by the parties.

The decree of the circuit court is affirmed. Costs and disbursements will be allowed to neither party.